**In re SLC LIMITED V, Debtor.**

**SLC LIMITED V, Plaintiff,**

v.

**BRADFORD GROUP WEST, INC., Defendant.**

**Bankruptcy No. 91B–03012.**
**Adv. No. 92PB–2195.**

United States Bankruptcy Court, D. Utah, C.D.

March 18, 1993.

Paul James Toscano, Cohne, Rappaport & Segal, P.C., and Paul James Toscano, Salt Lake City, UT, for plaintiff.

Craig L. Taylor, Ray, Quinney & Nebeker, Salt Lake City, UT, for defendant.

## MEMORANDUM DECISION REGARD-ING CROSS MOTIONS FOR SUM-MARY JUDGMENT

JUDITH A. BOULDEN, Bankruptcy Judge.

The cross motions for summary judgment in this adversary proceeding between the debtor and its primary secured creditor raise three issues. First, did the pre-petition appointment of a state court receiver result in a preferential transfer? Second, are funds from the settlement of litigation arising from breach of a real property lease general intangibles, or rents and proceeds? Third, did the secured creditor violate the Utah "one-action" rule by obtaining · judgment against guarantors before exhausting remedies against collateral? The pleadings on file, including the final pretrial order, indicate there are no material issues of disputed fact. The issues presented are matters of law and are ripe for summary judgment.

## I. UNCONTESTED FACTS

The chapter 11 debtor and plaintiff, SLC Limited V, a California limited partnership (SLCV), is one of a series of limited partnerships created to develop real property. Loran Corporation, Inc., a California corporation (Loran), is the general partner of SLCV. Irving N. Fisher and James F. Kern (Fisher and Kern) are president and vice president, respectively, and sole shareholders of Loran.

### A. *The Bradford Group Loan.*

By documents dated January 17, 1986, SLCV and The Bradford Group West, Inc., a Utah corporation (Bradford), entered into a Construction Loan Agreement for the construction of a mixed-use commercial property known as the West Town Center (West Town Center or Property). Bradford provided the financing for the construction in the form of a Trust Deed Note (Note) for $2,100,000 secured by a Trust Deed with Assignment of Rents (Trust Deed). The Trust Deed contained what was characterized as an absolute and unconditional assignment of rents. As additional security for the Note, Loran, on behalf of SLCV, executed and delivered to Bradford a separate Assignment of Leases and Rents (Assignment of Rents). Bradford recorded the Trust Deed and the Assignment of Rents in Salt Lake County on January 22, 1986. Bradford also filed an executed UCC-1 financing statement covering all tangible personal property of SLCV. The UCC-1 financing statement did not include general intangibles and choses in action.

As part of the loan agreement documents, Bradford obtained a separate Guaranty Agreement (Guaranty Agreement) from Fisher and Kern guaranteeing SLCV's payments under the Note. Fisher and Kern are sophisticated and experienced businessmen involved in a variety of real estate ventures. Bradford gave no additional consideration to Fisher and Kern for their personal guarantees except Bradford's consent to extend credit to SLCV.

On October 15, 1987, Eat–A–Burger, Ltd., (Eat–A–Burger) entered into a lease with SLCV for space at the West Town Center. The lease and the rents thereunder were subject to Bradford's Trust Deed and Assignment of Rents.

SLCV defaulted on its payments under the Note on or about January 17, 1987. The parties entered into two forbearance and extension agreements dated June 23, 1987, and July 31, 1990, but Bradford never waived its legal rights arising as a result of the default. SLCV defaulted on both of the forbearance and extension agreements.

In January of 1991, Bradford commenced nonjudicial foreclosure proceedings. It also initiated a state court proceeding seeking the appointment of a receiver to collect its interest in rents and proceeds from the West Town Center. On January 29, 1991, Bradford delivered to the tenants or posted on the premises, a notice of assignment of rents. Bradford and SLCV entered into a stipulation and the state court executed an order appointing Tate/Brubaker Real Estate Services as receiver on February 13, 1991. Tate/Brubaker immediately began collecting rents from tenants, but Eat–A–Burger refused to pay rents that it owed after February of 1991. Bradford scheduled a trustee's sale of the West Town Center, and on May 7, 1991, SLCV filed this chapter 11 proceeding.

### B. *Bankruptcy Court Proceedings.*

Bradford filed a notice pursuant to 11 U.S.C. § 546(b).[1] Bradford and SLCV filed a joint motion seeking permission for SLCV to use cash collateral that received court approval. The thirty page joint motion for the use of cash collateral recited that Bradford had a valid and perfected lien and security interest in SLCV's real and personal property. It also recited that Bradford had perfected its lien against the rents, revenues, issues, income, profits, and deposits from the West Town Center by virtue of its notice under § 546(b), and that the same were cash collateral. The stipulation provided for adequate protection of Bradford's interests in the use of its cash collateral by requiring payment to Bradford of all cash collateral in excess of a stipulated amount to cover operating expenses of the West Town Center.

On the same day Bradford filed the stipulation for the use of cash collateral, it also moved to lift the automatic stay. The court denied Bradford's stay lift motion and the battle ground changed to disclosure statement and confirmation issues. After this court denied confirmation, *see, In re SLC Ltd. V,* 137 B.R. 847 (Bankr. D.Utah 1992), Bradford renewed its motion for relief from the stay. The court granted the renewed motion for relief from stay, as well as SLCV's motion for stay pending appeal of the order granting stay relief. SLCV was unable to meet the bonding requirements of the order granting the stay pending appeal, and Bradford completed its foreclosure of the West Town Center on May 18, 1992, by credit bidding $1,370,000.

### C. *Bradford's Action on the Guaranty Agreement.*

During the bankruptcy proceedings relating to the stay lift and plan confirmation, Bradford continued its state court action against Fisher and Kern on the Guaranty Agreement. Fisher and Kern raised the Utah one-action rule as a defense, asserting that Bradford had elected foreclosure upon the real property as its sole remedy. On or about January 23, 1992, the state court awarded summary judgment to Bradford against Fisher and Kern in the approximate amount of $2,099,900.

---

**1.** Future references are to Title 11 of the United States Code unless otherwise noted.

### D. *The Eat–A–Burger Settlement.*

While SLCV was litigating various issues in bankruptcy court with Bradford, SLCV initiated a turnover action pursuant to § 542(b) against Eat–A–Burger. The complaint sought recovery of unpaid rent that SLCV characterized as accounts receivable arising from the unexpired but defaulted lease between the parties. The action resulted in a court approved settlement between Eat–A–Burger and SLCV (Eat–A–Burger Settlement). Eat–A–Burger agreed to pay SLCV $50,779.66 over time, representing $30,779.66 for delinquent rents and $20,000 in liquidated damages resulting from the breach of the lease before its expiration. The first breach of the lease occurred on January 10, 1991, and SLCV calculated the $30,779.66 from that date to October 31, 1991. The financial reports on file with the court show that the portion of the settlement representing delinquent rents consisted of three lease payments that accrued pre-petition with the balance accruing post-petition.

Bradford demanded payment from SLCV of the funds from the Eat–A–Burger Settlement asserting that such funds were subject to Bradford's Trust Deed and its Assignment of Rents. SLCV refused to remit the funds from the Eat–A–Burger Settlement to Bradford, arguing that they represented a general intangible not subject to Bradford's security interest. SLCV's counsel is holding all settlement funds in trust pending the outcome of these proceedings.

## II. DISCUSSION

The issues presented by these cross motions for summary judgment are core pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (K) and (O). The court can enter a final judgment pursuant to 28 U.S.C. § 1334 and Local Rule of District Court Procedure, D.Utah 404(a).

SLCV moved for partial summary judgment on its first and second claims for relief. It requested a judgment avoiding, as a preferential transfer, the perfection of Bradford's security interest in rents that SLCV asserts occurred upon the date of the state court order appointing a receiver. Bradford countered with a cross motion for partial summary judgment requesting dismissal of SLCV's first and second claims for relief. Bradford also counterclaimed seeking declaratory judgment that Bradford's interest in the funds resulting from the Eat–A–Burger Settlement was superior to the interest of SLCV, and that the funds should be accounted for and turned over to Bradford.[2]

At the time SLCV filed its complaint in this adversary proceeding, the court had granted stay relief but Bradford had not completed its foreclosure sale. By its third claim for relief, SLCV requested that the court permanently enjoin Bradford from conducting the foreclosure sale and collecting any deficiency. The basis asserted for the claim was that Bradford had violated Utah's one-action rule by pursuing simultaneous actions against the collateral and Fisher and Kern, the guarantors.

By the time SLCV filed its motion for partial summary judgment on its third claim for relief, Bradford had foreclosed on the Property. SLCV's pleadings asked for reconveyance of the West Town Center or money judgment of $1,370,000 (the amount of Bradford's credit bid). Bradford responded by filing a cross motion for partial summary judgment and requested dismissal of SLCV's third claim for relief asserting the one-action rule is not a defense to an action on a guaranty.

### A. *First and Second Claims for Relief: SLCV's Preference Actions Against Bradford and Bradford's Motion for Dismissal.*

SLCV contends that Bradford perfected its security interest in the rents and

---

**2.** Bradford's cross motion for partial summary judgment on SLCV's first and second claims for relief also effectively sought summary judgment on its counterclaim. SLCV's pleading in opposition to Bradford's motion for partial summary judgment on the first and second claims for relief fully explored all defenses to Bradford's counterclaim. Although the pleadings are somewhat ambiguous, the court considers all claims for relief to be fully briefed and before the court for disposition.

proceeds of the West Town Center when the state court appointed a receiver for the property on February 13, 1991. If this action constituted perfection of Bradford's security interest in rents, it occurred within the 90–day preference period prior to the filing of the chapter 11. SLCV argues that such perfection by Bradford for or on account of the antecedent debt owed by SLCV enabled Bradford to receive more than it would receive if the case were a case under chapter 7 and the transfer had not been made, and is therefore an avoidable transfer within the meaning of § 547(b).

Bradford argues that its interest in rents is an interest in real property that it perfected when it recorded the Trust Deed and Assignment of Rents in 1986. The state court appointment of a receiver simply enforced or activated its previously perfected interest and allowed Bradford to realize or possess the collateralized property. Bradford also asserts it's absolute assignment of rents gave it title to the rents upon SLCV's default prior to any preference period.[3]

### 1. Perfection of a security interest in rents is achieved by recordation, not by seizure.

Utah state law controls the property rights between SLCV and Bradford. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under the common law rule, a mortgagee was not entitled to the rents and revenue derived from property until it had taken actual possession of the mortgaged premises, or had caused the rents and revenues to be attached or otherwise sequestered, or caused a receiver to be appointed with authority to take possession to collect the rents. Because Utah is a lien theory state, SLCV asserts that the appointment of the receiver is the act that established perfection of Bradford's security interest. Utah's statutory scheme provides a method of perfecting a contractual security interest in rents that supersedes the common law.

As noted in *In re Tucson Industrial Partners*, 129 B.R. 614, 617 (9th Cir.BAP 1991), the term "perfection" is usually considered in the context of viability of a security interest under Article 9 of the Uniform Commercial Code. "A security interest in collateral is perfected as between the debtor and the secured creditor, and between the secured creditor and the unsecured creditors of the debtor, if the security instrument is executed as required by the U.C.C...." *Id.* at 618. Utah, as is the case with many other states, eliminated the requirement of execution of a security interest in rents and giving notice to third parties by recordation as provided in the U.C.C.[4] *See In re Polo Club Apartments Assoc.*, 150 B.R. 840, 846–47 (Bankr. N.D.Ga.1993).

Constructive notice of a security interest in rents created by an assignment is accomplished by recordation in the same manner as with the real property that produces the rents. Sections 57–1–1(3) and 19(5), Utah

---

**3.** Bradford characterizes the Trust Deed that contains an assignment of rents as creating an absolute assignment of SLCV's interest in rent and not an assignment for the purpose of security. If so, Bradford argues that the assignment served to transfer title to the rents to it upon the occurrence of the first default in January of 1987. Bradford finds the language of its Trust Deed to be similar to that discussed in *FDIC v. International Property Management*, 929 F.2d 1033, 1037 (5th Cir.1991), a case interpreting the law of Texas, another lien theory state. In *International Property Management* the court found that the intent of the parties clearly was to transfer an absolute, unconditional and presently effective interest in rents. The Fifth Circuit applied a seminal Texas case on assignment of rents clauses. *See Taylor v. Brennan*, 621 S.W.2d 592 (Tex.1981). In comparison, there is no seminal Utah case on assignment of rents. Because of the ruling set forth below, it is unnecessary and unwise for this court to venture into an anticipatory analysis of how Utah courts would characterize Bradford's assignment of rents clause.

**4.** An assignment of rents is excepted from the provisions of the Utah Uniform Commercial Code. Utah Code Ann. § 70A–9–104 provides:

This chapter does not apply:

. . . . .

(j) except to the extent that provision is made for fixtures in Section 70A–9–313, to the creation or transfer of an interest in or lien on real estate, including a lease or *rents* thereunder; . . . (emphasis added)

Code Ann., define real property as "any estate or interest in land, including ... rents, issues, profits, income...." The definition section also provides that "document" includes "every instrument in writing, including every conveyance ... concerning any ... interest in real property." Utah Code Ann. § 57–1–1(2). Under Utah law, a creditor perfects its security interest in real property by recordation of the applicable documents in the appropriate county recorder's office. Utah Code Ann. § 57–3–2(1). Such recordation cuts off the interest of any good faith purchaser for valuable consideration, and imparts notice of its contents to all parties. Utah Code Ann. §§ 57–3–3, 57–4a–3. It follows then, that since rents are considered real property, the perfection of an interest in rents is accomplished by recording the assignment of rents with the appropriate county recorder. Therefore, in Utah, recordation of an assignment of rents in the county in which the real property is located is equivalent to perfection.

Bradford held a perfected security interest in rents from the moment it recorded the Trust Deed and Assignment of Rents. Nothing in Utah's statutory scheme requires seizure of the real property or appointment of a receiver to perfect a security interest in real property, including an interest in rents and establish priority ahead of a subsequent good faith purchaser.

SLCV asserts that the Tenth Circuit's decision in *Virginia Beach Federal Savings and Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir.1990), is at odds with the analysis set forth above. The Tenth Circuit decided *Virginia Beach* under Oklahoma law. Oklahoma, like Utah, is a lien theory state where the mortgagor is the legal owner of the mortgaged property. See *State Bank of Lehi v. Woolsey*, 565 P.2d 413, 415 (Utah 1977). However, there are critical factual differences between *Virginia Beach* and the case at hand.[5] In *Virginia Beach*, the lender did not rely on its assignments of rents to advance its position. The *Virginia Beach* lender held an equitable interest that arose only upon a judicial determination made immediately prior to the filing of the chapter 11 petition. The court found there was no perfection of the lender's *equitable* security interest, under the facts of that case, because the lender had not obtained possession of the property or obtained the appointment of a receiver. In the instant case, Bradford recorded the Trust Deed and Assignment of Rents (an interest valid in Utah) in 1986, thereby placing all subsequent purchasers on notice of Bradford's interest in rents and proceeds. This court reaches a different conclusion from *Virginia Beach*, because in this case, the lender had properly perfected its *contractual* security interest upon recordation. Such perfection was sufficient to obtain priority ahead of a subsequent good faith purchaser.[6]

---

**5.** In *Virginia Beach*, the lender's claim to rental income was based upon the existence of the mortgage itself. The court found that the mortgage created an equitable lien on rents pending foreclosure. The lender's claim was not based on an assignment of interest in leases, because its assignment was against public policy at the time relevant to the case. The court found that the lender was not entitled to rents simply because it was a mortgagee, since a mortgagee, absent a valid assignment of rents, is not entitled to rents accruing after default unless and until it takes possession, personally or by a receiver duly appointed for that purpose. The court found that the lender merely held an equitable lien in rental proceeds as an incident of its mortgage rights according to an Oklahoma state statute. The court then looked to state law to determine whether the mortgagee had perfected its unrecorded equitable interest in rental income, and held that "for purposes of this case,

perfection is equivalent to the present right to receive the rental income." *Virginia Beach*, 901 F.2d at 852.

**6.** SLCV also cites as authority *In re Sunstone Ridge Associates*, Bankruptcy No. 85C–00199, Transcript of Hearing on Creditor's Motion for Stay Relief (Bankr.D.Utah June 3, 1985). The issue in *Sunstone* was whether, prior to appointment of a receiver but after written notice of demand, rent was cash collateral and whether the secured creditor had done everything necessary to protect its interest in the rent. The court predicted that Utah would likely follow the common law rule that a mortgagee is not entitled to the rents and revenue derived from the property until it has taken actual possession of the mortgaged premises, or had caused the rents to be attached, or otherwise sequestered, or has caused a receiver to be appointed. Since *Sunstone* was dealing with the issue of whether

### 2. There is a significant difference between perfection and enforcement.

■ This court finds persuasive the emerging line of case law finding that an interest in rents, regardless of whether it has been enforced or activated pre-petition, is in fact an existing security interest that is perfected by recording in the real property records as required by state law. Cases characterizing appointment of a receiver as perfection of a security interest in rents miss the point and confuse the distinction between the existence and perfection of a security interest in rents, and enforcement of that security interest. "In analyzing the creditor's right to the rents in situations such as presented here, the term 'enforcement' of the creditor's rights in the rents should be used rather than 'perfection' of a creditor's security interest...." *In re Foxhill Place Assocs.*, 119 B.R. 708, 711 (Bankr.W.D.Mo.1990). "Perfection" means the process by which the security interest achieves a status where it cannot be avoided by an intervening third party. *In re Park at Dash Point L.P.*, 121 B.R. 850, 853 (Bankr.W.D.Wash.1990). By comparison, "enforcement" refers to the steps the secured party must take to realize or possess the collateralized property. *Foxhill Place Assocs.*, 119 B.R. at 711.

In *Midlantic National Bank v. Sourlis*, 141 B.R. 826 (D.N.J.1992), the court discussed the essential distinction[7] between the two concepts:

> The concept of perfection involves the interests of a secured party vis-a-vis third parties, and recording serves to place such third-parties on notice of the existence of a secured party's interest. The concept of enforcement involves the relationship between the debtor, secured creditor and the collateral, and the steps that the secured creditor must take to enforce its rights in the collateral.

*Id.*, at 832.

In *Dash Point*, the court further explains that:

> The relationship between the timing of enforcement, and the specific rents to which the mortgagee is entitled, has engendered the description of security interests in rents as either "choate" or "inchoate." ... Functionally, these designations have depended upon whether a security interest in rents had been enforced by one of the permitted enforcement mechanisms (possession or the appointment of a receiver); the interest was termed "inchoate" if it was as yet unenforced, and therefore the mortgagee's interest in the rents remained prospective, not yet having risen to the level of the actual right to collect the rents.... The mortgagor is entitled to any rents paid while the assignment remains unenforced, or "inchoate." ...
>
> Regardless of the timing of enforcement, the recording of the assignment of rents perfects it, or ensures that it will be valid as against any subsequent "purchase" or "mortgagee" of the same property....
>
> As case law dealing with assigned rents has developed, the distinction between the concept of perfection and enforcement has become blurred, leading to

rents were cash collateral (not a preference issue as in this case), the court focused on whether the secured creditor had taken appropriate action to trigger the interest of the secured creditor under § 546(b), and found that it had. The court also found that rent collected prior to the date of filing did not constitute cash collateral because Utah law would require some further action to perfect an interest in rents.

In *Sunstone*, the Court used the term perfection in the comprehensive sense of the word, denoting an enforced or "choate" present right to receive rents. *Sunstone* was decided prior to the current trend of case law that differentiates between enforcement and perfection of security interests in rental proceeds. Even though Utah courts have not provided any other guidance on

this issue since *Sunstone* was decided, cases from other states with similar statutory schemes lead this court to a different prediction regarding the requirements of Utah law relating to perfection of an interest in rental income. Therefore, this court declines to follow the holding of *Sunstone*.

7. In bankruptcy, it is essential to observe this distinction because the mortgagee's right to enforce its interest in rents outside of bankruptcy is no longer available to it because of the automatic stay. Furthermore, § 552(b) does not refer to enforcement, but rather looks to the extent to which the secured creditor has rights in the rents under state law.

the association of the term "perfected" with the term "choate."

*Dash Point*, 121 B.R. at 855 (citations omitted). Thus, under Washington statutory law defining rents and interest therein as real property, the court held that assignments of rents are perfected when recorded, although the mortgagee obtains the right to collect the rents only after enforcing its perfected lien by obtaining possession of the real property or by appointment of a receiver. *See also In re KNM Roswell Ltd. Partnership*, 126 B.R. 548, 554 (Bankr.N.D.Ill.1991) (unless state law provides otherwise, the recording of the assignment of rents along with the remainder of the mortgage documents gives the mortgagee-assignee a perfected but inchoate lien on the rents and such interest is subject to the adequate protection requirements of sections 362 and 363(b)).

### 3. *The rents and proceeds from the West Town Center are cash collateral under § 363(a) and § 552(b).*

■ Bradford and SLCV entered into a cash collateral agreement where the parties stipulated that "[T]o the extent of Bradford's pre-petition security interests and liens in [SLCV's] property, those security interests and liens shall continue post-petition in the same pre-petition property of

[SLCV]." Cash Collateral Agreement at ¶ 36.[8] Although a security interest in property acquired after commencement of the case is generally not subject to a continuing lien, § 552(b) expressly provides that a perfected pre-petition security interest in rents and profits extends to such rents and profits acquired after commencement of the bankruptcy case to the extent provided by the agreement between the parties.

Section 552 deals with the post-petition character of security interests in property acquired post-petition. Section 552(a) provides that except as provided in subsection (b) of that section:

Property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

The exception, § 552(b), provides that:

Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, prod-

---

**8.** Having determined that Bradford perfected its security interest in rents upon recordation, it is unnecessary for the court to consider Bradford's alternative argument: that Bradford "perfected" its security interest in the rents post-petition by filing the § 546(b) notice on May 13, 1991. Although the court does not need to address this issue, some comment is compelled by Bradford's § 546(b) notice that seems to be driven by the same confusion about the significant difference between perfection and enforcement as discussed above. As Judge Volinn observed in *Dash Point:*

> Because an assignment of rents is perfected when recorded, and recording perfects the interest as of the date of such recording (and not retroactively), § 546(b) has no application to the perfection of an assignment of rents. The enforcement actions of obtaining possession or seeking the appointment of a receiver are not acts required to accomplish perfection, and therefore those enforcement acts are not subject to § 546(b).

*Dash Point,* 121 B.R. at 861; *see also In re Reliance Equities, Inc.,* 966 F.2d 1338, 1344 n. 7 (10th Cir.1992) (§ 546(b) inapplicable in a case

in which the security interest was perfected at the time the bankruptcy proceedings commenced); *Polo Club Apartments,* 150 B.R. at 851–52. Section 546(b) provides a method for perfection, but uses that term differently from cases discussing rents interest. Section 546(b) allows creditors to perfect certain security interests (such as mechanics liens) post-petition, with the perfection relating back to the pre-petition date. Section 546(b) is inapplicable in this case where Bradford perfected its security interest many years before SLCV commenced this bankruptcy proceeding. *Reliance Equities,* 966 F.2d at 1344, n. 7 (§ 546(b) is illustrative of Congress' desire to protect creditor from secret liens). Further, the legislative history indicates that the statute's drafters did not intend § 546(b) to empower bankruptcy courts to recognize rents interests post-petition that were unperfected pre-petition. Randolph, *Recognizing Lenders' Rents Interests in Bankruptcy,* 27 Real Prop.Prob. & Tr.J. 281, 319 (1992). Since this court holds that perfection is accomplished upon recordation under Utah law, no further discussion of the effect or necessity of Bradford's § 546(b) notice is required.

uct, offspring, rents, or profits of such property, then such security interest extends to such ... rents ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Therefore, a security interest in post-petition rents is permissible under § 552(b), but only if that lien was perfected under applicable state law and is not otherwise avoidable.

■ The Bankruptcy Code defines "lien" broadly enough to include inchoate liens. Section 101(37) defines "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." This court finds, consistent with the overwhelming trend in bankruptcy court decisions on the issue,[9] that the mere existence of the enforcement hurdle "does not preclude the lienholder's having rights under state law which ... rise to the level of a 'security interest' in the rents sufficient to render the rents cash collateral." *Dash Point,* 121 B.R. at 859. Therefore, Bradford retained a post-petition security interest in relation to third parties. By agreement, the parties also acknowledged that the rents and proceeds of the West Town Center are cash collateral under § 363(a) and § 552(b).

### 4. *The pre-petition appointment of a state court receiver is not a voidable preference under § 547(b).*

The provisions in § 552(b) note exceptions, including § 547, to that section's validation of pre-bankruptcy liens that attach to specified kinds of post-bankruptcy property interests. SLCV asserts that the state court appointment of Tate/Brubaker as the receiver of the West Town Center constituted a preferential transfer under § 547(b), thus eliminating the applicability of § 552(b).

Sections 547(e)(1) and (e)(2) are interrelated. Section 547(e)(2) provides that a transfer is made at the time it takes effect between the parties if it is perfected within ten days. Section 547(e)(1) defines what is considered perfection. Since Bradford's interest in rents is an interest in real property, a "transfer of real property ... is perfected when a bona fide purchaser ... cannot acquire an interest that is superior to the interest of the transferee." § 547(e)(1)(A).

In this case, the transfer that cut off a bona fide purchaser's rights was the execution and recordation of the documents in 1986, outside the ninety day period prior to filing. Bradford perfected its interest by filing with the recorder in the proper county and such recordation constituted notice to all parties and acted to cut off any interest not recorded prior to Bradford's interest. Since a trustee could not avoid Bradford's perfected security interest, Bradford did not receive more as a result of the enforcement action in state court than it would have received through liquidation.

■ The only other way a chapter 7 trustee could avoid Bradford's interest would be through the trustee's avoiding powers under § 544(a)(1) or (2). Section 544 permits the trustee to avoid interests that lenders fail to perfect, under state law, prior to bankruptcy. This section does not apply to rents interest in real estate mortgages if the lender properly records the security agreements creating those interests and if state law gives the interests priority over competing creditors when enforced. Section 544 should not impede

**9.** *See Midlantic Nat'l Bank v. Sourlis,* 141 B.R. 826 (Bankr.D.N.J.1992); *In re Fin. Center Assocs. of East Meadow, L.P.,* 140 B.R. 829 (Bankr. E.D.N.Y.1992); *In re Vienna Park Properties.,* 136 B.R. 43 (S.D.N.Y.1992); *In re Northport Marina Assocs.,* 136 B.R. 911 (Bankr.E.D.N.Y.1992); *In re Tucson Indus. Partners,* 129 B.R. 614 (9th Cir.B.A.P.1991); *In re Rancourt,* 123 B.R. 143 (Bankr.D.N.H.1991); *In re KNM Roswell Limit-* ed Partnership, 126 B.R. 548 (Bankr.N.D.Ill. 1991); *In re Park at Dash Point, L.P.,* 121 B.R. 850 (Bankr.W.D.Wash.1990); *In re Foxhill Place Assocs.,* 119 B.R. 708 (Bankr.W.D.Mo.1990); *In re Metro Square,* 106 B.R. 584 (D.Minn.1989); *In re Greenhaven Village Apartments of Burnsville Phase II Ltd.,* 100 B.R. 465 (Bankr.D.Minn.1989); *In re Porter,* 90 B.R. 399 (N.D.Iowa 1988).

post-petition recognition of rents claims. Section 552(b) validates rents claims in bankruptcy if valid under state law and permits creditors to enforce rents claims. Once enforced, pre- or post-petition, courts. should recognize these claims. This court interprets § 552 and § 544 consistently with *Butner* and acknowledges rents claims when a creditor seeks such recognition in bankruptcy court. SLCV has identified no other basis under any other provision of the Bankruptcy Code that would allow a trustee to avoid Bradford's secured interest in rents. Neither § 547 nor § 544 have any impact upon Bradford's perfected security interest, therefore, SLCV's first and second claims for relief shall be denied.

**B.** *Bradford's First and Second Claims for Relief: Bradford's Interest in the Eat–A–Burger Settlement, Accounting and Pay Over.*

■ SLCV argues that the Eat–A–Burger Settlement funds are not subject to Bradford's perfected security interest in rental income from the West Town Center because the settlement proceeds are not rents generated by the lease or ordinary operation of the Property, and are not "real property" as defined by Utah Code Ann. § 57–1–19(5) or § 57–1–1(3). Instead, SLCV characterizes the settlement funds as either: the proceeds of a lawsuit as defined by Utah Code Ann. § 68–3–12(2)(m) ("Personal property includes ... evidences of rights in action...."); or general intangibles as defined by Utah Code Ann. § 70A–9–106 (general intangibles means personal property (including "things in action")). As a result, SLCV concludes that the secured transaction filing requirements of Article 9 of the Utah Uniform Commercial Code (UUCC) apply to the settlement funds. Bradford did not perfect a security interest in choses in action or general intangibles because it did not file a UCC–1 covering those specific items of personalty.

**1.** *The Eat–A–Burger Settlement consisted of pre- and post-petition rents and liquidated damages.*

The Eat–A–Burger settlement approved by the court contained the following representation:

1. The Defendant agrees to pay the Plaintiff settlement in the amount of $50,779.66, which represents $30,779.66 for delinquent rents and $20,000 in damages resulting by the Defendant's breach of the lease prior to its expiration term.

Eat–A–Burger Settlement, p. 2.

At the time this court approved the Eat–A–Burger Settlement, SLCV agreed that a portion of the settlement represented pre- and post-petition rent, and a portion represented liquidated damages for the tenant's improper termination of the lease agreement. SLCV's counsel is holding the fund represented by the settlement in a separate escrow account pending resolution of these proceedings. The settlement fund was not commingled and is readily identifiable. Identification of the source of the fund is important to a determination of whether Bradford's security interest covers the settlement fund. *In re Polo Club Apartment Assocs.*, 140 B.R. 840, 855 (Bankr.N.D.Ga. 1993), discussed a similar issue involving settlement proceeds.

> The difficulty with Claimants' position is that they have presented no evidence to identify or trace the rents or their proceeds.... Even if the court concluded that Claimants' agreements were sufficiently broad to encompass a conversion claim, however, they have presented no evidence to show which of the multiple claims were settled by the Trustee, or that those settled are identifiable and traceable back to the original rents claimed. Further, Claimants presented no evidence to establish a proper allocation of the Settlement Proceeds to each of the claims which the Trustee settled. Absent such evidence, Claimants' proof fails.

In *Polo Club*, the court declined the claimant's request for turnover of unidentifiable settlement proceeds. By comparison, the settlement proceeds in this case are clearly traceable to the original lease agreement with Eat–A–Burger, a West Town Center tenant.

**2. The nature of Bradford's property interest cannot be determined by unilateral action of SLCV.**

■ A creditor's vested interest in property is determined as of the inception of the insolvency proceeding. *In re Airport Inn Assoc. Ltd.*, 132 B.R. 951, 955 (Bankr. D.Colo.1990), citing *In re Hugo*, 58 B.R. 903, 907 (Bankr.E.D.Mich.1986). Bradford's interest in the rents from the Property are real property interests and as such are explicitly excluded from Article 9 of the UUCC. *In re Standard Conveyor Co.*, 773 F.2d 198, 204 (8th Cir.1985). *In re Bristol Assocs. Inc.*, 505 F.2d 1056, 1064 (3rd Cir.1974).

Essentially, SLCV's position requires a finding that once the rents have been transformed into liquidated damages, the rents become something other than real property. The apparent consequence of this transformation is the conversion of the creditor from a secured position to an unsecured position as a result of SLCV's independent decision to file a lawsuit against Eat–A–Burger. This metamorphosis places an insupportable burden upon a creditor. It compels the creditor to re-perfect its security interest after the borrower takes some kind of action even though the borrower would not necessarily put the creditor on notice of the borrower's action. It would be impossible for the creditor to determine what action or point in time the chrysalis turns into a butterfly based on the unilateral action of the borrower.

SLCV argues that the point in time that the rents became damages (and, therefore, something other than rents) was the commencement of the lawsuit. Since the complaint characterized the action as one to collect rents, that argument is not compelling. If the transforming catalyst was SLCV's characterization of the settlement funds as partially rent and partially liquidated damages in the settlement documents, that characterization would be self-serving and not controlling.

The more accurate analysis of the nature of the funds in this case focuses upon the basis of the suit itself, and not on the point in time that SLCV took its unilateral action or SLCV's characterization of the settlement funds. The basis of the suit undeniably relates to SLCV's ownership of the real property. The method chosen by SLCV to collect rents cannot change the fundamental characteristic of income derived from rental of real property. Rental income is directly tied to, and wholly dependent upon, the use of the real property. *See In re GGVXX, Ltd.*, 130 B.R. 322, 326 (Bankr.D.Colo.1991) (rent from golf school was result of debtor's ownership of real property rather than business efforts).

**3. The Cash Collateral Agreement recognizes Bradford's security interest.**

The Eat–A–Burger litigation was commenced in October of 1991, after SLCV and Bradford entered into the Cash Collateral Agreement. The Cash Collateral Agreement provided that SLCV was (1) authorized to collect rents and take any necessary legal action to cause a collection of the rents; (2) required to insure and direct that all Cash Collateral was immediately deposited in the Cash Collateral Account and; (3) required SLCV to pay to Bradford the balance of the monies on deposit in the Cash Collateral Account each month. Cash Collateral Agreement, ¶¶ 4, 9, 16.[10] The Cash Collateral Agreement granted Bradford a continuing lien in all rents and the proceeds of rents received after May 7, 1991, paid on account of leases entered into by SLCV prior to commencement of its case. Cash Collateral Agreement, ¶ 19. Since Eat–A–Burger was already in default at the time

---

**10.** SLCV agreed to adequately protect Bradford for its liens and interests by paying to Bradford the balance of the monies on deposit in SLCV's cash collateral account, less a reserve. In addition, SLCV assigned to Bradford as additional collateral, SLCV's interest in any new or renegotiated or rewritten leases, executed after the commencement of the Chapter 11 case, and granted a continuing lien in all rents and proceeds received after May 7, 1991. SLCV and Bradford agreed that all cash collateral derived from or attributable to the property up to the date of termination of the stipulation would be governed by its provisions. SLCV's post-petition property manager was to turn over to Bradford all of the net operating revenue (excess rents after expenses of operations) on a monthly basis.

of filing, it is realistic to expect that the parties anticipated the Eat–A–Burger Settlement funds were subject to the Cash Collateral Agreement.

#### 4. *Bradford is entitled to relief on its counterclaim.*

Bradford initially attempted to add Eat–A–Burger as a party to this litigation so the court could enter an order directing Eat–A–Burger to forward settlement funds to Bradford. Such an order will not be necessary. The court can afford Bradford complete relief by granting judgment establishing that Bradford's interest in the Eat–A–Burger Settlement is superior to SLCV's interest in the settlement funds. The court will grant Bradford's motion for summary judgment on the first and second claims for relief contained in Bradford's counterclaim.

### C. *SLCV's Third Claim for Relief: Application of Utah's One–Action Rule.*

SLCV argues that Utah's one-action rule barred the continuation of the motion to lift the automatic stay after Bradford amended its complaint in state court to proceed against the guarantors. SLCV seeks, in effect, forfeiture of Bradford's lien as a remedy for Bradford's alleged violation of the one-action rule and requests equitable relief in the form of reconveyance of the West Town Center. In the alternative, SLCV seeks a money judgment against Bradford for $1,370,000 representing the appraised value of the property and Bradford's credit bid at the foreclosure sale.

#### 1. *SLCV did not suffer any direct harm prohibited by Utah's One–Action Rule.*

 Utah's one-action rule [11] requires that there be but one action on a debt

secured solely by real property, and that the property be sold and proceeds applied to the debt prior to any other action to realize on the debt. [12] Isolation of the particular action by Bradford that allegedly violated the one-action rule controls which entity is entitled to any remedy. SLCV argues that Bradford's state court action against Fisher and Kern on the Guaranty Agreement was reduced to judgment prior to the completion of the stay lift and foreclosure; therefore the action on the Guaranty Agreement constitutes Bradford's sole remedy. SLCV contends that Bradford's action on the stay lift in the bankruptcy case is the action that violated the one-action rule to SLCV's detriment: therefore the result of the stay lift action is void. Conversely, if SLCV asserted that Bradford's state court prosecution of the Guaranty Agreement violated the one-action rule (as was previously plead by Fisher and Kern in the state court action), then any damages would run to Fisher and Kern, not to SLCV, and any claim for damages would not be property of this estate. This distinction is important because many of the SLCV's arguments complain of damages allegedly suffered by Fisher and Kern, rather than any harm suffered by SLCV. If Fisher and Kern were the parties actually harmed by any alleged violation of the one-action rule, it is of no particular concern to this court except to the extent that depletion of assets of the shareholders of Loran may indirectly damage SLCV or its creditors. This nexus is tenuous at best.

 The one-action rule dictates the *procedure* by which a creditor may collect a debt secured by real property if a debtor

---

**11.** Utah Code Ann. § 78–37–1 provides:

There can be one action for the recovery of any debt or the enforcement of any right secured solely by mortgage upon real estate which action must be in accordance with the provisions of this chapter. Judgment shall be given adjudging the amount due, with costs and disbursements, and the sale of mortgaged property, or some part thereof, to satisfy said amount and accruing costs, and directing the sheriff to proceed and sell the same according

to the provisions of law relating to sales on execution, and a special execution or order of sale shall be issued for that purpose.

**12.** Seven states have some form of the one-action rule: California, Utah, Nevada, Idaho, Montana, North Dakota, and New Jersey. *See Milliner, Real Property Collateral: The One–Action Rule in Action,* 1991 Utah L.Rev. 557, 562 (citations to state statutes omitted).

defaults. *City Consumer Servs. Inc. v. Peters*, 815 P.2d 234, 235 (Utah 1991). The one-action rule serves several purposes. The one-action rule protects a debtor from both creditor harassment through a multiplicity of actions on the same underlying debt, and from the possibility of a creditor obtaining a double recovery. *See, First Sec. Bank of Utah, N.A. v. Felger*, 658 F.Supp. 175, 182 (D.Utah 1987). The one-action rule forces the creditor to exhaust its collateral and liquidate any deficiency before reaching a debtor's general assets through a deficiency judgment. *See, Utah Mortgage & Loan Co. v. Black*, 618 P.2d 43, 45 (Utah 1980). The one-action rule also functions to utilize judicial resources in an economical manner. Milliner, *Real Property Collateral: The "One–Action" Rule in Action*, 1991 Utah L.Rev. 557, 559. The corresponding Utah anti-deficiency statute protects a debtor without a right of redemption from a creditor who could purchase the property at a non-judicial sale for a low price and attempt to hold the debtor liable for a large deficiency. *Felger*, 658 F.Supp. at 183.

Comparing the recognized purpose of the one-action rule to the treatment of SLCV, it is apparent that Bradford's actions have not violated the protection offered by the one-action rule. The one-action rule requires a "security first" approach: the creditor must proceed to foreclose on its real property collateral and liquidate the amount of its deficiency before collecting on the balance of the debt. The Bankruptcy Code provides a method that allows a creditor to proceed to foreclosure and Bradford used this method by filing its action for relief from stay. SLCV was not forced to defend a multiplicity of actions on one debt. SLCV defended only the contested matter in this court on Bradford's motion to lift the automatic stay. Bradford did not initiate any other action against assets of the estate, if any exist. Application of both the one-action rule and Utah's anti-deficiency statute, Utah Code Ann. § 57–1–32, protects SLCV against the possibility of

double recovery on the debt. Preservation of judicial resources has been achieved as it relates to this estate because the parties litigated the issues incident to Bradford's stay lift motion only once.

Regardless that all the protective purposes of the one-action rule were accomplished in these bankruptcy court proceedings and that SLCV did not suffer the direct harm proscribed by the one-action rule, SLCV asserts several theories for relief and maintains its argument that Bradford violated the one-action rule. SLCV contends that even though Fisher and Kern may have suffered direct harm, Bradford's recovery resulting from the violation of the one-action rule should inure to the benefit of this estate by way of nullifying the ruling on the stay lift and the subsequent foreclosure.

### 2. The One–Action Rule does not prevent Bradford from pursuing an action against the guarantors.

█ Utah courts have not yet applied Utah's one-action rule to guarantors of debts secured solely by real property in any reported decisions. *But see Kennedy v. Bank of Ephraim*, 594 P.2d 881 (Utah 1979) (creditor secured by personalty not required to satisfy debt from collateral pledged by guarantor); *FDIC v. Bismarck Inv. Corp.*, 547 P.2d 212, 214 (Utah 1976) (in action to enforce a guaranty agreement secured by personalty where guarantor filed chapter 11, court held creditor not required to exhaust remedy against personalty before seeking judgment against joint obligor). There is no case law nor is any direction provided by the statute relating to the type of action that may represent a violation of the one-action rule, merely that there be only one action.

The statutory language of the one-action rule also contains no language that expressly protects guarantors.[13] However, in a case prior to the Uniform Commercial Code when the one-action rule applied to both real and personal property security,

---

**13.** In Alaska the deficiency statute expressly extends to guarantors. Alaska Stat. Section 34.20.-

100.

the Utah Supreme court held that the one-action rule applies only to actions between a creditor and a debtor. *See Pillsbury Mills v. Nephi Processing Plant,* 323 P.2d 266, 268 (Utah 1958) (payment of debt secured by interest in turkeys). Other courts have also held that because the one-action rule only applies to actions between a creditor and a debtor, a creditor can sue a third-party guarantor directly on the guaranty without first foreclosing on the real property securing the underlying debt. *See Developers Small Business Inv. Corp. v. Hoeckle,* 395 F.2d 80 (9th Cir.1968); *Bank of Kirkwood Plaza v. Mueller,* 294 N.W.2d 640 (N.D.1980); *First Nat'l Bank of Nevada v. Barengo,* 91 Nev. 396, 536 P.2d 487 (1975).

In reported cases involving debts secured by collateral other than real property, Utah courts generally treat guaranty agreements as separate and independent liabilities from that of the principal obligors. Section 70A–3–416(1), Utah Code Ann., defines "guaranty of payment," such as that executed by Fisher and Kern, to mean "that the signer engages that if the instrument is not paid when due he will pay it according to its tenor...." In an action on a guaranty agreement for debt secured by personalty, the Utah Supreme Court explained:

> [A] guarantee of payment is absolute, and the guaranteed party need not fix its losses by pursuing its remedies against the debtor or the security before proceeding directly against the guarantor.

*Strevell–Paterson Co., Inc. v. Francis,* 646 P.2d 741, 743 (Utah 1982); *see also, Valley Bank and Trust Co. v. Rite Way Concrete Forming, Inc.,* 742 P.2d 105, 108 (Utah Ct.App.1987), *cert. denied* 765 P.2d 1277 (Utah 1988). Other state courts considering the issue have held that it is not necessary to pursue the obligor or collateral prior to collecting on a guaranty of payment. *See First Nat'l Bank & Trust of Williston v. Ashton,* 436 N.W.2d 215 (N.D. 1989), quoting *Bank of Kirkwood Plaza v. Mueller,* 294 N.W.2d 640 (N.D.1980) (construing North Dakota's one-action rule and anti-deficiency statute). Neither *Strevell–Paterson* nor *Rite Way Concrete* were re-

lated to real property. There is no reported Utah case law directly analyzing the effect of the one-action rule on an action against a guarantor of a debt secured solely by real property. Regardless of the shortage of case law in this state specifically related to real property, a rational extension of the existing case law leads this court to conclude that, in this case, the one-action rule does not prevent a creditor on a debt secured by real property from pursuing an action against the guarantors based on the guarantee without first foreclosing on the security.

### 3. *Fisher and Kern are not co-obligors on the debt.*

SLCV advanced several alternative arguments as to why the court should apply the one-action rule in this case should it reach the conclusion announced above. First, SLCV argues that Fisher and Kern are in fact and in substance, principal obligors on the construction loan. In some circumstances, a court may consider a guarantor to be a co-obligor of the underlying debt, thus precluding any proceeding against the guarantor without first foreclosing on the security. *Ashton,* 436 N.W.2d at 220; *Component Sys. Corp. v. Eighth Judicial Dist. Court,* 101 Nev. 76, 692 P.2d 1296, 1299–1300 (1985) (applying and construing California law). *But see Union Bank v. Gradsky,* 265 Cal.App.2d 40, 71 Cal.Rptr. 64, 67 n. 3 (1968) (action against guarantor not violative of one-action rule when debtor specifically waives right).

SLCV asserts that although Fisher and Kern are characterized as guarantors, they are really co-obligors because they were the only parties with sufficient financial strength to satisfy Bradford in the event of a default. Fisher and Kern are the officers and sole shareholders of Loran, the corporate general partner of SLCV. At the time Bradford made the loan to SLCV, Fisher and Kern personally possessed significant financial resources. SLCV's only asset was the construction site, although it was to become title owner of the West Town Center, including improvements, after com-

pletion of construction. Fisher and Kern, as officers of Loran, the corporate general partner, executed the Assignment of Rents, Note and Trust Deed on behalf of SLCV. Fisher and Kern executed the Guaranty Agreement in their individual capacities.

The Guaranty Agreement provides:

Guarantors hereby jointly and severally:

1. Unconditionally and absolutely guarantee the due and punctual payment of the principal of the note, the interest thereon and any other sums due or which may become due thereon, and the due and punctual performance and observance by debtor of all other terms, covenants and conditions of the Note, Trust Deed, Construction Loan Agreement, Security Agreement, and any other document or instrument securing the note....

The Guaranty Agreement also provides that:

4. [T]his Guaranty may be enforced by Beneficiary without first resorting to or exhausting any other guaranty, security or collateral or without first having recourse to the Note or any of the property covered by the Trust Deed or other document or instrument securing the Note, through foreclosure proceedings, trustee's sale or otherwise.

The Guaranty Agreement is a separate guaranty of payment, and it expressly provides that the guaranty is enforceable without first resorting to foreclosure of the collateral. Nonetheless, SLCV contends that Bradford obligated the financially weaker parties, the partnership debtor and the debtor's general partner, as principal obligors, and the financially stronger parties as the guarantors, to circumvent the one-action rule. SLCV argues that where Bradford imposed the burden of principal-obligors on Fisher and Kern, but denied them the benefit of the one-action rule, the rule should be extended to protect insider guarantors as if they were principal obligors. This argument fails because SLCV confuses the entity whose interests this court must protect: this court must protect the interests of SLCV, not Fisher and Kern.

SLCV relies on the holding of *First National Bank & Trust of Williston v. Ashton*, 436 N.W.2d 215 (N.D.1989). In that case, the guarantors were personally liable on the underlying note and deed of trust. The court reasoned that the guaranty did not enlarge the guarantors' liability, and the one-action rule prevented the bank from pursuing an action against the guarantors based on the guaranty. *See Ashton*, 436 N.W.2d at 220; *accord, First Interstate Bank of Fargo, N.A. v. Larson*, 475 N.W.2d 538, 542 (N.D.1991) (general partnership is association of persons, not a separate legal entity, and partners' personal guarantee added nothing to their liability); *Lawyers and Home–Makers Bldg. & Loan Ass'n v. Kohn*, 14 N.J.Misc. 153, 183 A. 467 (N.J.Sup.Ct.), *rev'd on other grounds*, 117 N.J.L. 238, 187 A. 538 (1936).

SLCV's reliance on *Ashton* is misplaced due to the significant factual distinction between that case and the instant case. Unlike the facts in *Ashton*, Fisher and Kern did not sign the Note and Trust Deed in their individual capacities. Instead, SLCV is the sole obligor on the Note and Trust Deed. Fisher and Kern are shareholders of Loran, SLCV's corporate general partner, and also receive the benefits and protection of the corporate formation. In this case, Fisher and Kern incurred liability in separate and distinct capacities: restricted liability as shareholders of the corporate general partner and individual liability as guarantors of the partnership debt. Fisher and Kern were not the principal debtors on the debt secured by the Property. Because Fisher and Kern are not co-obligors, the Guaranty Agreement is a separate obligation from the Note and Trust Deed. *See Victory Highway Village, Inc. v. Weaver*, 480 F.Supp. 71 (D.Minn.1979) (guarantors liable even if the principal debtor is discharged from any or all of its liability); *Bank of Kirkwood Plaza v. Mueller*, 294 N.W.2d 640 (N.D.1980) (shareholder guarantors of debtor corporation not protected by anti-deficiency statute). The Guaranty Agreement significantly enlarged Fisher

and Kern's liability on the debt. Fisher and Kern's status as guarantors was not the equivalent status of co-obligors on the underlying debt.

### 4. *The Guaranty Agreement did not require separate consideration.*

▪ SLCV also urges this court to find a violation of the one-action rule arguing that Fisher and Kern are principal obligors in part because they did not receive additional consideration for the Guaranty Agreement other than the loan proceeds paid to SLCV. In Utah, it is not necessary that the consideration for the promise of a guaranty be distinct from the principal debt. *Bray Lines, Inc. v. Utah Carriers, Inc.*, 739 P.2d 1115 (Utah Ct.App.1987). "The extension of credit ... [is] adequate consideration to support [a] Guaranty Agreement." *Boise Cascade Corp. v. Stonewood Dev. Corp.*, 655 P.2d 668, 669 (Utah 1982).

The court declines to characterize Fisher and Kern as co-obligors on the Note. The use of the word "guaranty" is conclusive in determining its character. It is probably correct that Bradford based its decision to make the loan to SLCV on the personal wealth of Fisher and Kern. That inference, however, does not make Fisher and Kern primary obligors. The Guaranty Agreement executed by Fisher and Kern contained language to meet almost every conceivable condition of default. Fisher and Kern, as sophisticated borrowers, were willing to accept the risk at the time the loan was made even though they were constructively charged with full knowledge of the consequences of their promise. Fisher and Kern should not now be allowed to accuse Bradford of unjustly manipulating the statutory scheme to collect on their unconditional promise to pay SLCV's debt to Bradford.

### 5. *The Guaranty Agreement is a separate, unsecured debt.*

▪ Next, SLCV argues that the one-action rule limits Bradford to only one action on a debt secured by real property regardless of how many guarantors are obligated on the note.[14] SLCV argues that if the only consideration given by Bradford on both the principal Note and the Guaranty Agreement is the loan itself, then there is but one debt created on which two or more parties are obligated. Because there is only one debt, Bradford can elect only one action upon the single debt. SLCV asserts that notwithstanding that there is a separate guaranty contract, with separate parties, separate terms, and separate rights, there is only one debt. Bradford argues that the Guaranty Agreement is not a debt secured by real property; rather, the Note is the debt secured by a mortgage on real property, and the Guaranty Agreement is an independent contract supported by adequate consideration.

The court finds Bradford's analysis to be the better argument. As previously noted, Utah law recognizes that extension of credit by a lender is sufficient consideration to render a guaranty agreement enforceable on the same loan. *Boise Cascade Corp. v. Stonewood Dev. Corp.*, 655 P.2d 668, 669 (Utah 1982) (the extension of credit is adequate consideration to support a guaranty agreement); *Bray Lines, Inc. v. Utah Carriers, Inc.*, 739 P.2d 1115 (Utah Ct.App. 1987).

It is correct that there is only one obligation in the sense that Bradford can collect the amount owed to it only once, however the Guaranty Agreement is not enforceable absent a default by SLCV. In addition, the Guaranty Agreement is not secured by real property and is, therefore, a separate, unsecured obligation. *See First Sec. Bank of Idaho, N.A. v. Gaige*, 115 Idaho 172, 175, 765 P.2d 683, 686 (1988); *First Fed. Sav. & Loan Assoc. of Bismarck v. Scherle*, 356 N.W.2d 894, 896

---

**14.** Although this issue was not addressed or argued by the parties, it is consistent with applicable Utah law classifying an interest in rents or leases as an interest in real property that neither the assignment of rents contained in the Trust Deed or the separate Assignment of Rents, taken as additional security for the Note, removes this transaction from the purview of the one-action rule which applies only to debt secured "solely by real property."

(N.D.1984); *Bank of Kirkwood Plaza*, 294 N.W.2d at 643; *Riverside Nat'l Bank v. Manolakis*, 613 P.2d 438 (Okla.1980)

### 6. Utah's One–Action Rule should not be extended by judicial interpretation in the absence of legislative intent.

The central theme underlying SLCV's assertion that Fisher and Kern are substantively co-obligors on the Note is also the basis for SLCV's alternative grounds for recovery. SLCV argued that, while it may be true that the Guaranty Agreement created an independent liability and the automatic stay does not preclude collection of such liability, the operation of the one-action rule and Utah's guaranty law, Utah Code Ann. § 70A–3–416(1), renders Fisher and Kern's liability co-extensive with the liability of the primary obligor. Therefore, because a personal guarantee is a guaranty to pay the obligation of the primary obligor, the conditions affecting the primary obligation also affect the guarantor's obligation.

SLCV looks to opinions of the Nevada Supreme Court and the Ninth Circuit Court of Appeals interpreting anti-deficiency frameworks in Nevada (a one-action rule state) where the courts applied the deficiency limitation of the anti-deficiency statute to guarantors after foreclosure of real property collateral. SLCV argues that the one-action rule should be extended by implication to guarantors on public policy grounds. This court need not reach the merits of SLCV's reliance on these cases because it declines to extend protection of Utah's one-action rule to those not expressly covered by the statute by applying the case law of other jurisdictions through analogy to extensions of anti-deficiency

statutes. Nothing in the recent Nevada and California cases dealing with deficiency judgment issues requires a lender to first seek satisfaction from the collateral before suing a guarantor.[15]

Although the Nevada court is "convinced that it is unsound to deny guarantors the benefits of [anti-deficiency] legislation," *First Interstate Bank of Nevada v. Shields*, 102 Nev. 616, 730 P.2d 429, 431 (1986), the better reasoned state court decisions considering the issue have declined to expand the coverage of the statute. *First Sec. Bank of Idaho, N.A. v. Gaige*, 115 Idaho 172, 765 P.2d 683 (1988), citing *Bank of Kirkwood Plaza v. Mueller*, 294 N.W.2d 640 (N.D.1980); *Riverside Nat'l Bank v. Manolakis*, 613 P.2d 438 (Okla.1980). In *Gaige*, the Idaho Supreme Court recognized that "while there may be arguments for extending anti-deficiency protection to guarantors, that action is for the legislature to do, not the court." *Gaige*, 765 P.2d at 685. This court agrees with the reasoning of the Idaho court, especially as it finds itself in the position of a federal court applying state law concerning an unresolved legal issue of significant importance to all aspects of commercial lending. This issue simply is not a matter suitable for judicial interpretation at this stage in the evolution of Utah law. This court cannot ignore a relevant line of case law absent more explicit direction from the state legislature that it explicitly intended to protect guarantors through extended application of the one-action rule. Therefore, the court denies SLCV's motion for summary judgment on its third claim for relief.

### III. CONCLUSION

Based upon the analysis set forth above, the court denies SLCV's motions for sum-

---

**15.** *See e.g. First Interstate Bank of Nev. v. Shields*, 102 Nev. 616, 730 P.2d 429 (1986); *FBW Enters. v. Victorio Co.*, 821 F.2d 1393 (9th Cir. 1987) (applying Nevada law). Anti-deficiency statutes require a creditor to seek its remedies first against the collateral in order to ascertain the fair market value of the property so that the amount may be subtracted from the total indebtedness before proceeding on collection of its deficiency claim. SLCV contends that the purpose of the anti-deficiency statutes and the

one-action rule is virtually identical. Therefore, the arguments supporting the decisions in *Shields* and *FBW Enterprises* apply as well to extension of Utah's one action rule to guarantors and all other obligors on a debt secured solely by realty. Neither case directly overruled Nevada case law concerning the one-action rule. Nevada's one-action rule does not bar a direct suit against a guarantor before foreclosure. *Coombs v. Heers*, 366 F.Supp. 851 (D.Nev.1973); *First Nat'l Bank v. Barengo*, 91 Nev. 396, 536 P.2d 487 (1975).

mary judgment on all three claims for relief contained in its complaint and grants Bradford's motion for summary judgment dismissing the claims for relief. The court grants Bradford's counterclaim for declaratory judgment, accounting and turnover of the Eat–A–Burger Settlement proceeds. A separate judgment consistent with this memorandum decision shall be entered concurrently.